IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| NEEKO GORDON, | ) Case No. 1:19 CV 1106 |
| | ) |
| Petitioner, | ) JUDGE JAMES R. KNEPP II |
| | ) |
| v. | ) MAGISTRATE JUDGE |
| | ) JENNIFER DOWDELL |
| JEFF NOBLE, WARDEN, | ) ARMSTRONG |
| | ) |
| Respondent. | ) |
| | ) **REPORT & RECOMMENDATION** |
| | ) |

## I.     INTRODUCTION

Petitioner Neeko Gordon ("Gordon") seeks a writ of habeas corpus under 28 U.S.C. § 2254, claiming that his convictions in *State v. Gordon*, Eighth District Cuyahoga No. CR-16-609261, 2018-Ohio-2292, violated his constitutional rights. (ECF Doc. 1.) Jeff Noble, the respondent ("Respondent"), is the former warden of the Madison Correctional Institution in London, Ohio, where Gordon is currently incarcerated. (ECF Doc. 11.) Respondent filed a return of writ. (*Id.*) Gordon did not file a traverse.

Respondent was the warden of the Madison Correctional Institution at the time Gordon filed his writ. (*Id.*) The current warden is Leon Hill, who should be substituted as the proper respondent in this case. *See* 28 U.S.C.§ 2243 ("The writ . . . shall be directed to the person having custody of the person detained."); Fed. R. Civ. P. 25(d) (providing that, "when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending[,]" "[t]he officer's successor is automatically substituted as a party.").

The matter is before the undersigned by an automatic order of reference under Local Rule

72.2 for preparation of a report and recommendation on Gordon's petition or other case-dispositive motions. For the reasons set forth in detail below, I recommend that the Court DISMISS and/or DENY his petition.

## II.    RELEVANT FACTUAL BACKGROUND

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts "shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); *see also Spagnola v. Horton*, No. 17-1462, 2017 WL 8948745, *2 (6th Cir. Oct. 30, 2017). The Ohio Court of Appeals for the Eighth District set forth the following facts on direct appeal:

> {¶ 3} On August 25, 2016, Robert Holsey ("Holsey") agreed to purchase marijuana from Gordon. Holsey and Gordon knew each other from playing basketball at Trent Park. Nieves drove Holsey to the marijuana-purchase-meeting place on W. 38th Street in Cleveland. As Nieves and Holsey drove toward the meeting place, they saw Gordon, became suspicious, and started to drive away. Through the side mirror of the car, Holsey saw Gordon raise his arm with an object in his hand, then Holsey heard shots fired. Gordon ran away. Holsey realized Nieves had been shot. Holsey, who was in the passenger seat of the vehicle, ducked to avoid further gunfire and pressed the gas pedal with his hand. Holsey stopped the car at the next intersection, put Nieves in the back seat, and drove toward MetroHealth. Holsey got into an accident near the hospital, and called 911.

> {¶ 4} When the police arrived, Holsey told them that Nieves was shot by a man named "Neeko" who stays at a house on W. 41st Street. The police went to this house and found Gordon there. Holsey identified Gordon as the person who shot Nieves. Nieves later died from a gunshot wound to the neck and head.

*Gordon*, 2018-Ohio-2292, at ¶¶ 3-4.

## III.    RELEVANT STATE PROCEDURAL HISTORY

### A.    State Court Conviction

On September 2, 2016, a Cuyahoga County Grand Jury issued an indictment charging Gordon with the following counts:

Counts One: Aggravated Murder in violation of Ohio Rev. Code Ann. § 2903.01(A) with accompanying firearm specifications;

Count Two: Murder in violation of Ohio Rev. Code Ann. § 2903.02(B) with accompanying firearm specifications;

Count Three: Felonious Assault in violation of Ohio Rev. Code Ann. § 2903.11(A)(1) with accompanying firearm specifications;

Count Four: Felonious Assault in violation of Ohio Rev. Code Ann. § 2903.11(A)(2) with accompanying firearm specifications;

Count Five: Attempted Murder in violation of Ohio Rev. Code Ann. § 2923.02 with accompanying firearm specifications;

Count Six: Felonious Assault in violation of Ohio Rev. Code Ann. § 2903.11(A)(2) with accompanying firearm specifications; and

Count Seven: Discharge of Firearm on or Near Prohibited Premises in violation of Ohio Rev. Code Ann. § 2923.162(A)(3) with accompanying firearm specifications.

(*See* ECF Doc. 11-2, Exhibit 1.)

Gordon, through his appointed counsel, pleaded not guilty to all charges and the matter proceeded to a jury trial in June 2017. (*See* ECF Doc. 11-2, Exhibit 2; ECF Doc. 11-2, Exhibit 3.) The Ohio Court of Appeals for the Eighth District summarized the testimony presented at trial as follows:

### Eyewitness Robert Holsey

{¶ 6} Holsey testified that he and Nieves ran into Gordon at a convenient store on Fulton Road on August 25, 2016. Holsey knew Gordon because they had played basketball together in the neighborhood. Video surveillance footage from the convenient store was introduced into evidence. It showed Holsey, Nieves, and Gordon in the store and in the parking lot on the day in question. Gordon was wearing an orange shirt in the video, and he had a dark-colored shirt or towel slung over his shoulder.

{¶ 7} Holsey arranged to buy marijuana from Gordon. Gordon said the marijuana was "stashed," and they were to meet nearby on W. 38th Street. Nieves drove his white Toyota Corolla, with Holsey in the passenger seat, to the meeting place. As they were driving north on W. 38th Street toward Robert Avenue, they saw Gordon waving at them.

{¶ 8} According to Holsey, "something odd came about." Holsey continued:

As we was coming closer, he kept going back toward the fence. * * * That's cool. But what didn't make sense is what the neighbors — he's an African

3

American man and * * * there's Caucasian white people right there and they're just staring at him. And he's waving us towards the gate. That didn't make no sense. That was hot. As I mean hot that was too — that was too noisy policewise. The neighbors look like why is he there? That didn't make sense to us. So as we drove off, Neeko Gordon was come here, right here. I got it right here. It didn't make no sense at all.

As soon as we went * * * he fired two, three shots as he was running towards the car.

* * *

What I could see was him waving us towards the — trying to get us to exit the vehicle towards the car. We said no. There was people out there that was staring at him out the window like why is he right there and there was another guy on his porch looking him [sic] weird. We wasn't going to get out of the [sic] and do a drug deal and somebody call the police right there.

* * *

It was pure daylight. He was the only African American man by that fence and by that area and the rest were just two white guys and somebody staring out the window.

{¶ 9} Asked what Gordon was wearing that day, Holsey replied, "Neeko Gordon was wearing an orange shirt. He had on like something on top of his shirt like he was holding like a towel because it was hot or a T-shirt because it was real hot." Holsey further testified that Gordon was wearing "black or bluish" sweatpants. Holsey testified that, from his "vantage point," he did not see Gordon with a gun. Asked how he knew that Gordon fired the shot, Holsey testified as follows:

Because as I heard the first gunshot I looked back instantly and I could see through that side window right him going like this, his arm extended like this, orange T-shirt something still above his thing but there definitely was an object in his hand there should be no reason his arm was up pointed towards as soon as I looked through that side window right there and after the last shot I could see him run down.

* * *

He ran towards the main street. He seemed like he was just running. I'm sorry. It was a quick glance. It was fast because I wanted to duck from the bullet. But as soon as I looked through that side window was Neeko that guy right there with his arm up pointed forward just like that.

And I grabbed [Nieves] and I grabbed his head down so he wouldn't get hit but he was already dead. It was him. It was him. It was him.

4

{¶ 10} Holsey testified that after he heard the first gunshot and noticed that Nieves was dead, he grabbed Nieves and "went down. I hit the gas pedal with my hand while grabbing [Nieves] and I'm steering and I just flew down the street. * * * I know I had to hit two or three cars but that's what I had to do. It was gunshots going." Holsey made it to the next street and "threw" Nieves in the back seat of the car. Holsey drove toward MetroHealth, but he rear-ended another car at the corner of W. 25th and Meyer Avenue. Holsey called 911. Holsey testified that Nieves was bleeding "uncontrollably" and ultimately Nieves was taken by ambulance to the hospital.

{¶ 11} Holsey told the police that he knew where the person who shot Nieves was. "I know what house he at." Holsey testified that when he played basketball with Gordon, Gordon was "always in front of that house on 41st." Holsey told the police the shooter's name was "Neeko" and described his appearance, including "a tattoo that says 'Heaven' right here on his chest." The police drove Holsey to the house he identified at 3252 W. 41st Street. Gordon was there and the police brought him outside. Gordon had changed his pants and had no shirt on, but Holsey identified him as the person who shot Nieves.

{¶ 12} On cross-examination, Holsey testified that he saw Gordon in the driver's side-view mirror "running towards the car with his arm extended," although Holsey did not see Gordon with a gun. Defense counsel asked Holsey the following:

> Q: Well, what did Neeko have in his hand every minute of this video that you just watched? What did he have in his hand the whole time he talked to you by that car? What did he have in his hand?

> A: A phone.

**Officer Noel Hernandez**

{¶ 13} Cleveland police patrol officer Noel "Bo" Hernandez testified that on August 25, 2016, he responded to an emergency call of "a male shot * * * in the area of W. 38th and Clark." Officer Hernandez was rerouted to W. 25th Street and Meyer Avenue, where the shooting victim and the driver were involved in a motor vehicle accident. When officer Hernandez arrived at the scene, he saw a white car and Holsey "outside screaming for help. Screaming for my help and screaming for police help and yelling at us that his brother has been shot." According to Officer Hernandez, Holsey was "hysterical."

{¶ 14} Holsey indicated that he knew who the shooter was, and he believed he knew where the shooter went — to a house on "41st and Storer." Officer Hernandez called his Lieutenant and got permission to bring Holsey to the house in question. Police officers knocked, and three black males opened the front door. All three males were shirtless. All three denied being in the area of the shooting. The police told the men they were "investigating a shooting that happened not too long ago." One officer also stated, "and this might be related to a possible

5

homicide." Gordon responded, "So he died?"

{¶ 15} The officers took Gordon outside for a cold stand. Officer Hernandez "heard [Holsey] scream that's him. That's the shooter. That's the guy who killed [Nieves]." The police arrested Gordon at this time.

**Detective Walter Emerick**

{¶ 16} Cleveland police detective Walter Emerick testified that he works for the crime scene investigation unit, and he performed a gunshot residue test on Gordon's hands while Gordon was outside on W. 41st Street, just over two hours after the shooting took place. Detective Emerick also recovered an "[o]range T-shirt out of the hamper within one of the bedrooms," a black cell phone, and ".22 live rimfired rounds," which are unfired bullets. On cross-examination, Det. Emerick testified that he did not "bag" Gordon's hands nor were Gordon's hands bagged at anytime that he was aware of.

**Detective David Borden**

{¶ 17} Cleveland police homicide Det. David Borden testified that he responded "to the intersection of W. 38th and Robert [Avenue] and we started to canvass the area for witnesses and other evidence that might be useful in this homicide investigation." Det. Borden spoke with Anthony Sobczyk, who lives one or two houses from where the shots were fired. Sobczyk gave the following description of the suspect: "black male, five-ten, five-eleven, medium build, wearing a red shirt and blue jeans and short hair." According to Det. Borden, Sobczyk informed him that the suspect used a revolver in the shooting and fired two shots. Det. Borden testified that the police did not find any shell casings on the scene. According to Det. Borden, "[r]evolvers do not eject casings."

{¶ 18} Det. Borden testified that he interviewed Farmer Baker, who lives on the corner of W. 38th and Robert Avenue and saw "an individual running west on Roberts" wearing a red shirt.

**Forensic Scientist Lisa Przepyszny**

{¶ 19} Lisa Przepyszny testified that she is a forensic scientist in the trace evidence department of the Cuyahoga County Medical Examiner's Office. Przepyszny analyzed the gunshot residue test taken from Gordon's hands on August 25, 2016. She found "particles that were characteristic of * * * gunshot primer residue and that would indicate that either the individual fired a gun, was in close proximity to a fired gun, or handled an object that had gunshot residue on it."

**Deputy Medical Examiner Dr. Todd Barr**

{¶ 20} Dr. Todd Barr testified that he is a forensic pathologist who is serving as a deputy medical examiner in the Cuyahoga County Medical Examiner's Office. Dr. Barr performed Nieves's autopsy on August 26, 2016, and concluded that Nieves

died from "a gunshot wound to the head and neck." In Dr. Barr's opinion, Nieves' wound "is most consistent with a distant gunshot wound [of] [g]reater than four feet." According to Dr. Barr, "the path of the projectile, it entered in the * * * left side in the back of the neck, back of the head, and basically went through the skin soft tissue muscles. * * * And then it travels through and fractures one of his neck bones, one of his vertebrae. * * * And then it comes out through the back of his mouth * * *." Dr. Barr determined that the manner of death was homicide.

**Eyewitness Anthony Sobczyk**

{¶ 21} Anthony Sobczyk testified that he lives at 3278 W. 38th Street in Cleveland, and on August 25, 2016, at about 4:30 p.m., he witnessed a shooting on his street. He was getting pizzas out of the passenger side of his car, which was parked on the street, when he saw a "[b]lack male, about 18, short, short hair, medium build" walking "suspiciously" down the street. Sobczyk testified that the person was wearing "I believe jeans and I think a bright shirt." According to Sobczyk, this person was suspicious because "in a matter of seconds he disappeared. * * * He crouched behind the fence."

{¶ 22} Sobczyk's testimony continued: "Then I seen a white car coming down the street slowly. It wasn't racing or nothing. Stopped at the stop sign. Next thing I know the guy jumped up, went in the street, fired the shot, car took off, that was it." Sobczyk testified that he did not see anybody else on the street, and he only heard one shot. According to Sobczyk, the man was about 15 feet from the car when he fired the shot.

**Officer Jonathan Holub**

{¶ 23} Cleveland police officer Jonathan Holub testified that he is Officer Hernandez's partner, and he was driving their zone car on August 25, 2016, when they responded to the shooting in question. The officers first went to W. 38th and Clark, near where the shooting occurred, then went to W. 25th and Meyer, where Holsey and Nieves got into the car accident. Next, Officer Holub drove Officer Hernandez and Holsey, who was in the backseat, to "the area of W. 41st [and] the house where the suspect was."

{¶ 24} After Gordon's arrest, Gordon is captured on Officer Holub's body camera talking to a relative through the police car window. This family member came outside from the house where the police found Gordon. After reviewing the video from his body camera, Officer Holub testified that Gordon said, "it's not enough. [T]hey don't got shit on me." Officer Holub further testified that Gordon "said he was alone" at the time of the incident.

**Eyewitness Letha Sanchez**

{¶ 25} Letha Sanchez testified that she was sitting on the front porch of a home located at W. 38th Street and Robert Avenue on August 25, 2016, when she heard gunshots. Sanchez hurried off the porch and saw "somebody go by with a red shirt

and black pants on. And it looks like he was putting a gun in his pocket as he was running. * * * I just hurried up and * * * got in my car and left." Sanchez testified that she "was in a panic" and her observation "was real brief." Sanchez recalled that the person was "a black male," but other than his clothing, she could not identify him. Sanchez did not recall seeing anybody else.

**Detective Thomas Lynch**

{¶ 26} Cleveland police Det. Thomas Lynch testified that he interviewed Gordon, who had been taken into custody at 3252 W. 41st Street. Gordon was in the back seat of a zone car and agreed to speak with Det. Lynch about "what was going on that day." Det. Lynch testified that Gordon said he was at his girlfriend's house, then he took the bus to W. 25th Street and Clark, "then made his way to the convenience store on Fulton, Fulton Beverage * * *." Gordon ran into Holsey, who "he knew from the neighborhood, I believe he said it was from playing basketball * * *." Gordon told Det. Lynch that he was wearing a white T-shirt when he saw Holsey. Gordon said he took the white T-shirt off at his aunt's house on W. 41st Street, "before the police arrived." Det. Lynch asked Gordon if he had a cell phone, and Gordon told him that he did not, because he smashed it after a fight with his girlfriend and threw it in a dumpster.

{¶ 27} Det. Lynch testified that the police obtained permission from the owner of the house on W. 41st Street to "take a look around" for a gun. The police recovered Gordon's cell phone and "some bullets" from the owner of the house's bedroom. Additionally, they "recovered an orange shirt with a stain on the front of it" from a clothes hamper.

{¶ 28} Det. Lynch interviewed Gordon again at the police station the next day. Gordon now told police that he had two cell phones, the one he smashed and the one found in the house on W. 41st Street. Additionally, when the police told Gordon that surveillance video from the day of the shooting showed him wearing an orange shirt — and not a white one, which is what he previously told the police — Gordon admitted that he had been wearing an orange shirt the day before. Gordon then gave the police "three basic stories as to what had occurred."

> [T]he first time we asked him about what had happened he said that he was walking on West 38th Street when the car that he had talked to at the convenient store drove by him and he told us as the car drove by him, someone from behind him had shot at the car.
>
> * * *
>
> The second story that he told was that as he got to the corner after leaving the store and walking across the street as he was at the corner, the car passed by him and he saw the male that he had talked to at the store like had his hand in the air like he was saying what's up and he — so he responded like what's up like this, raising his hand up in the air.

8

But he could not explain how Ricardo Nieves got shot.

And then the third way he explained what had happened — basically about three-quarters of the way into the interview he's like I'm going to tell you the truth.

And he * * * stated that as he was walking down West 38th Street the vehicle that he had encountered and spoke with Robert Holsey in at the convenience store came down the street and as this vehicle approached him, Robert Holsey was holding his hand in the air like he had a gun and that Neeko held his hand up in the air * * * like to scare him like he had a gun pointed in his direction and then Neeko heard a gunshot. And I asked him where did the gunshot come from and he couldn't explain where the gunshot came from.

{¶ 29} According to Det. Lynch, in all three versions of his story, Gordon claimed that he was by himself and that he ran away from the scene.

{¶ 30} On cross-examination, Det. Lynch stated that he did not interview the two other black males who were in the house on W. 41st Street at the time Gordon was arrested. He also stated that "one or two" of the eyewitnesses to the shooting that were interviewed stated that the shooter was wearing a red, rather than an orange, shirt. However, Det. Lynch testified that "[r]ed and orange is not a big discrepancy in my opinion."

[I]f someone was saying the shooter had a white shirt on, then we'd have a problem. Or if the shooter had a yellow shirt on, we have a problem. Red and orange can be easily mistaken.

People see colors differently. I can see something as one color and someone else sees it as a different shade of blue or something along those lines.

Red and orange in my opinion and Det. Sandoval's opinion was not a huge discrepancy.

{¶ 31} Det. Lynch testified that video surveillance footage taken from a nearby neighborhood camera shows Gordon "running down the alley" wearing an orange shirt at 4:41 p.m. on August 25, 2016, which is immediately after the shots were fired.

{¶ 32} Det. Lynch testified that the orange shirt that was recovered from the clothes hamper was not the same orange shirt that Gordon was wearing in the video footage captured just prior to and after the shooting.

{¶ 33} Det. Lynch also established that nobody saw Gordon with a gun on day of the shooting, and nobody saw more than one person running from the scene. The neighborhood eyewitnesses, who do not know Gordon, heard gunshots and saw a black male in a "bright" or red T-shirt run away from the scene, heading west on Robert. Holsey, who knows Gordon, heard gunshots and saw Gordon, through the

9

side-view mirror of the car, approaching the car with his arm pointed out and then running from the scene.

**Toni Roberson**

{¶ 34} Toni Roberson testified that on August 25, 2016, she was living at 3252 W. 41st Street, and Gordon, who she has known "since he was about three," was staying with her. Gordon was friends with her son Joe Butler. On that day, Gordon called Roberson looking for Butler. Roberson was at the store at the time. According to Roberson, there was nothing out of the ordinary about the call or the way Gordon sounded. When she went home, Gordon, Butler, another friend, and the police were there. Roberson gave the police permission to search her home. The police recovered bullets but did not recover a gun from her house. Roberson testified that the bullets the police found belonged to her, although she did not own a gun.

**Joseph Butler**

{¶ 35} Joseph Butler testified that, on August 25, 2016, he was living at 3252 W. 41st Street with his mother. He and Gordon grew up together. That afternoon, Butler was at a store on W. 38th and Newark when Gordon called him and said, "I just did a drill." Butler testified that a "drill" meant that Gordon "just shot or killed somebody." According to Butler, Gordon was "real hyped like, you know, just hyped, like real hyped, anxious and stuff. [H]e was asking where I was at, come home now, come home now." Butler went home and Gordon "was waiting for me at the screen door. And that's when he went inside. He took his shirt off, like a peach shirt, he took it off, and then that's when the cops * * *, everybody came and stuff." Butler testified that Gordon put his shirt "right on his dirty clothes, his clothes bag."

{¶ 36} Butler let the police in his house and he, Gordon, and another friend were asked questions. Although Gordon had told Butler that he just shot somebody, Butler made no mention of this to the police. Asked why, Butler testified as follows:

> A: Cuz I didn't want to be involved around this. I didn't want to be doing this * * * what I'm doing now. I don't want to be around the police, court, none of that, so I don't want nothing to do with this. But since he's trying to say I did it, yeah.

> Q: Did you do it?

> A: No.

> Q: Did you have anything to do with it?

> A: No. I wasn't even there.

{¶ 37} Butler testified that he knew Holsey through other friends and they "hung out." Eventually they stopped hanging out, and Butler testified as to why:

> A: When me and [Gordon] and [Holsey], we hit a lick and [Holsey] hit his house for bread and we ain't even seen him since that day. And probably like two and a half, three years.
>
> Q: All right. So you said that [Gordon] and [Holsey] hit a lick?
>
> A: Yeah.
>
> Q: What does that mean?
>
> A: Basically, well, we went — we took somebody up top basically.
>
> Q: Took somebody up top? What does that mean?
>
> A: Strong arm them.
>
> Q: You robbed somebody?
>
> A: Well, basically.
>
> Q: With the two of them[?]
>
> A: Yeah, basically.
>
> Q: And then you said that he —
>
> A: He ran off. He just —
>
> Q: [Holsey?]
>
> A: He ran of[f] and we ain't never seen him since then.
>
> Q: And he took the money you were supposed to have?
>
> A: We supposed to split it basically but he went his separate way and that was that. We ain't never seen him since then until — until he saw him.

{¶ 38} Butler testified that "back in these days in August," Gordon "was carrying a revolver," and Butler saw Gordon with it "two days before" the shooting. Asked why Butler did not tell the police this, Butler replied, "That was because I didn't want to get involved with none of this stuff at all. Period." Butler testified that he did not carry a gun; however, on cross-examination, defense counsel introduced seven photographs Butler posted on his Facebook page that showed him with a gun or multiple guns, more than one of which was a revolver.

11

**Detective Joselito Sandoval**

{¶ 39} Cleveland police homicide Det. Joselito Sandoval testified that he and his partner Det. Lynch investigated the murder of Nieves in August 2016. Det. Sandoval testified that, according to Holsey, who witnessed the shooting, the suspect was named or nicknamed "Neeko." After interviewing witnesses and gathering information, Det. Sandoval found no reason to develop any other suspects in this case.

> We had learned that there was one suspect in this shooting * * *.

> We also saw the direction that was consistent with the witnesses on the direction in which he fled from that intersection of West 38th and Robert which is the direction of the house we were at West 41st.

> Also based on our interviews with Toni Roberson and her son and friend, they were consistent in their statements that they weren't present at the house when the shooting occurred and were at a different location up towards Clark Avenue and returned * * * just prior to the police arriving.

{¶ 40} Det. Sandoval testified about surveillance video from a camera located at 3919 Robert Avenue, just west of W. 38th Street. The video shows that on August 25, 2016, at 4:38 p.m., Nieves's white Corolla traveled through the intersection of W. 38th Street and Robert Avenue. Gordon, who is wearing the same orange T-shirt with a dark colored shirt or towel over his shoulder that he was wearing in the Fulton Beverage video from earlier that day, is seen "running from where that car came from. There he goes. He runs to W. 39th Street up toward Hyde Court."

{¶ 41} Det. Sandoval next testified about surveillance video taken from a camera located at 3929 Hyde Court. The video shows that on August 25, 2016, at 4:39 p.m., Gordon ran down Hyde Court, which is an alley, heading toward W. 41st Street and wearing the same orange T-shirt with the dark shirt or towel over his shoulder.

{¶ 42} Det. Sandoval next testified about his familiarity with the county's system of monitoring telephone calls made by inmates from the county jail. "Inmates when they arrive at county jail are given specific [PIN] numbers to them to make phone calls." Det. Sandoval testified about a particular call that was played for the jury. Gordon allegedly identified himself at the beginning of the call. "[T]hey have the greeting and part of the greeting is they advise you this call is from — and they fill it in with their name, which was Neeko, and then it continued to advise you about it being monitored and recorded." The prosecutor then asked Det. Sandoval the following:

> Q: Were you able to hear the defendant in that clip talking about ditching the gun?

> A: Yes.

12

{¶ 43} Det. Sandoval testified that, essentially, Gordon's phone conversation from jail is about a hypothetical. Asked if Gordon said that he "hid a gun," Det. Sandoval answered, "No."

{¶ 44} Det. Sandoval next testified about a picture that he found posted on a Facebook page belonging to "Yonko Boolin." According to Det. Sandoval, Yonko was Gordon's nickname. Det. Sandoval testified that there "appears to be a shotgun in his right hand and he's standing next to a male in a yellow shirt that appears to have a firearm stuck in his waistband like towards the front." On cross-examination, Det. Sandoval testified that he does not know when this picture was taken, he does not know if the gun is real, and he does not know who the man in the photo is.

{¶ 45} Det. Sandoval testified that the shirt that was confiscated from the house on W. 41st is not the same shirt that Gordon was wearing in the video surveillance footage. Det. Sandoval testified that Holsey's testimony about what he saw through the side mirror of the car is consistent with what the other witnesses saw.

The actions of the suspect are identical to what the witnesses had given us.

And you're right, I understand red shirt, and * * * his pants were very dark blue. But, the action of the suspect and this vehicle at the intersection were described as Mr. Holsey describes it.

So they kind of corroborated what he did tell us. And the direction of flight, it's the same thing.

* * *

We have witnesses that were at that intersection that saw the shooter run up to the victim's vehicle moving north bound at Robert Avenue, shoot into the car, the only person out there on foot, and then flee on Robert.

We obtained video. If you'll look at the video, there's only one subject that comes running in that direction from that white car and it's Neeko Gordon.

And he runs downs the alley towards the house where he's later found.

* * *

But see the clothing he's wearing; you see he's one in the same from the store.

* * *

From the store he's wearing the blue shirt over his shoulder just like he is in the alley where he's seen with the blue shirt over his shoulder carrying his

13

tennis shoes in the other and his hand down in his pocket.

*Gordon*, 2018-Ohio-2292, at ¶¶ 6-45 (alterations in original).

On June 20, 2017, the jury returned its verdict. (*See* ECF Doc. 11-8, PageID # 970-74.) The jury found Gordon not guilty of aggravated murder and attempted murder, and found him guilty of the remaining charges and specifications. (*Id.*) The trial court sentenced Gordon to an aggregate prison term of 28 years to life. (*See* ECF Doc. 11-2, Exhibit 5.)

### B.    Direct Appeal

Gordon, through counsel, pursued a timely direct appeal in the Ohio Court of Appeals for the Eighth District. (*See* ECF Doc. 11-2, Exhibit 6.) Gordon's appellate brief raised the following six assignments of error:

> Assignment of Error I – Appellant's convictions were not supported by sufficient evidence and the trial court erred by denying his motion for acquittal.
>
> Assignment of Error II – The convictions were against the manifest weight of the evidence.
>
> Assignment of Error II – The trial court erred by admitting a jail call that was not properly authenticated and violated Evid.R. 401, 402[,] and 403 and deprived Appellant of his constitutional rights to due process and a fair trial.
>
> Assignment of Error IV – The trial court erred by admitting a Facebook photograph (State's exhibit 217) that was not properly authenticated and violated Evid.R. 401, 402[,] and 403 and deprived Appellant of his constitutional rights to due process and a fair trial.
>
> Assignment of Error V – The trial court erred by giving a flight instruction over Appellant's objection and that was not supported by the record.
>
> Assignment of Error VI – The trial court erred and violated Appellant's Due Process right to a fair trial by allowing Joe Buter to testify, over the defense's objections, that Appellant carries a revolver and had been seen with it days before the shooting.

(*See* ECF Doc. 11-2, Exhibit 7, PageID # 106.) On June 14, 2018, the Ohio Court of Appeals for the Eighth District overruled Gordon's assignments of error and affirmed his convictions. *Gordon*, 2018-Ohio-2292, at ¶ 2.

14

### C. Ohio Supreme Court

On July 25, 2018, Gordon, *pro se*, filed a notice of appeal in the Supreme Court of Ohio.

(ECF Doc. 11-2, Exhibit 10, PageID # 209.) Gordon raised the following four propositions of law:

PROPOSITION OF LAW NUMBER I: Appellant's conviction[s] were not supported by sufficient evidence in violation of his 6th and 14th Amendment rights under the United States and the Ohio Constitutions.

PROPOSITION OF LAW NUMBER II: The trial court erred by admitting a jai call that was not properly authenticated and violated Evid.R. 401, 402, and 403, in violation of Appellant's 6th and 14th Amendment rights under the United States and the Ohio Constitutions.

PROPOSITION OF LAW NUMBER III: The trial court erred by admitting a Facebook photograph that was not properly authenticated and violated Evid.R. 401, 402, and 403, in violation of Appellant's 6th and 14th Amendment rights under the United States and the Ohio Constitutions.

PROPOSITION OF LAW NUMBER IV: The trial court erred and violated Appellant's due process right to a fair trial by allowing Joe Butler to testify that Appellant carried a revolver and had been seen with it days before the shooting.

(ECF Doc. 11-2, Exhibit 11, PageID # 211.) On October 10, 2018, the Ohio Supreme Court

declined to accept jurisdiction of Gordon's appeal. (ECF Doc. 11-2, Exhibit 12.)

## IV. FEDERAL HABEAS CORPUS PETITION

On May 16, 2019, Gordon, *pro se*, filed the instant petition for writ of habeas corpus

asserting the following four grounds for relief[1]:

**GROUND ONE:**
The trial court violated constitutional dictate by admission of highly prejudicial evidence inducing wrongful conviction in violation of the 6th & 14th Amendment protections under the United States Constitution and State & Federal Evidence Rules 401, 402, & 403.

**SUPPORTING FACTS:**
The trial court admitted evidence that was testified by Detectives concerning specific evidence that substantially prejudice, obfuscated the issues, and mislead the jury. (1): A Detective testified about a jail call but had no expertise or knowledge of mechanical or electronic transmission or recordings to make a cognizable assessment of the jail phone system this was critical because the detective testified that Gordon allegedly made an

---

[1] Gordon's grounds for habeas relief asserted in his Petition are set forth verbatim herein, including certain typographical and/or grammatical errors.

admission that a gun was "ditch[ed] the gun." Such testimony more than likely persuaded the jury to convict Gordon off an inaccurate and anomalous procedure. (2): The Detective next was allowed to testify concerning specific evidence that substantially prejudice, obfuscated the issues, and mislead the jury. Evidence that was elicited to induced the danger of unfair prejudice of character evidence inadmissible to prove that a person acted in conformity with an alleged bad reputation; evidence of a Facebook photo that was unauthorized in which no expert witness was obtained; a photo allegedly of Gordon holding a gun. Evidence erroneously admitted went beyond harmless and had substantial and injurious effect on the guilt, innocence and punishment; evidence confirmed by the state court was erroneously admitted and had the tendency to show that Gordon is the type of person who has a gun. Wherefore, the petitioner's conviction and sentence must be reversed and vacated.

**GROUND TWO:**
The trial court violated Petitioner's due process right to a fair trial by allowing prejudicial testimony of Petitioner's alleged criminal character and suggested criminal conduct.

**SUPPORTING FACTS:**
The trial court erred in admitting evidence of acts allegedly admitted by the petitioner to draw attention away from the state's burden of proof that weighed heavy when there existed exculpatory facts to corroborate petitioner's innocence; evidence from a state's witness that Gordon "carr[ies] a revolver." The state court acquiesce that such testimony found in a trial is improper; Federal and Ohio courts have recognized the introduction of other weapons evidence - i.e., irrelevant evidence of weapons unrelated to the charges - as error requiring reversal. However, the state court facetiously rejects Gordon claim on the flimsy notion that the "him" quoted in the record has uncertain reference to whom the state witness referenced - yet, the state court quotes this witness as relating such testimony to the petitioner. Wherefore, the petitioner's conviction and sentence must be reversed and vacated.

**GROUND THREE:**
Petitioner's convictions were not supported by sufficient evidence erring in the trial court's denial of motion of acquittal.

**SUPPORTING FACTS:**
The trial court erred in [not] issuing a judgment of acquittal when the prosecution's evidence was insufficient to sustain a conviction of the offenses. The state failed to prove all counts; evidence that was inadmissible and therefore insufficient to carry the state's burden of proving the guilt of the accused beyond the reasonable doubt; there is no physical evidence, nor any eye witness evidence that Gordon committed this crime; A conviction that was seated with the admission of undisputed erroneous evidence - evidence unable to link Gordon - Consequently, procuring a conviction merely on speculation from inadmissible, unauthenticated and highly prejudicial evidence that impeded the jury in resolving conflicts in the evidence; evidence that suggests that the jury clearly lost its way and a manifest miscarriage of justice has occurred. A conviction of such magnitude is not · sufficient ai1d constitutionally sustainable. Furthermore, video of a frighten individual is not sufficient to take the liberty...However, annexed to the erroneous evidence admitted, Gordon's conviction was inflammable.

(ECF Doc. 1, PageID # 3-5.)

## V.    STANDARDS OF REVIEW AND GOVERNING LAW

### A.    Jurisdiction

28 U.S.C. § 2254(a) authorizes this court to entertain an application for a writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A state prisoner may file a § 2254 petition in the "district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him[.]" 28 U.S.C. § 2241(d). The Court of Common Pleas of Cuyahoga County sentenced Gordon, and the Court takes judicial notice that Cuyahoga County is within this Court's geographic jurisdiction. (ECF Doc. 11-2, Exhibit 5.) Accordingly, this Court has jurisdiction over Gordon's § 2254 petition.

### B.    AEDPA Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs Gordon's petition for writ of habeas corpus. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Murphy v. Ohio*, 551 F.3d 485, 493 (6th Cir. 2009). AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases," and "'to further the principles of comity, finality, and federalism[.]'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 420, 436 (2000)). The Act "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). It therefore "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id*.

One of AEDPA's most significant limitations on district courts' authority to grant writs of

habeas corpus is found in § 2254(d). That provision prohibits federal habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Habeas courts review the "last *explained* state-court judgment" on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis in original). A state court has adjudicated a claim "on the merits[,]" and AEDPA deference applies, regardless of whether the state court provided little or no reasoning at all for its decision. *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

"Clearly established Federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes only "'the holdings, as opposed to the dicta, of [Supreme Court] decisions.'" *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Howes v. Fields*, 565 U.S. 499, 505 (2012)). The state court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them; it is sufficient that the result and reasoning are consistent with Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). A state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state-court decision is contrary to "clearly established Federal law" under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on

a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). And "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

A state court's determination of fact is unreasonable under § 2254(d)(2) only if the court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003). The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 571 U.S. at 18 (quoting § 2254(e)(1)); *see also Rice v. White,* 660 F.3d 242, 250 (6th Cir. 2011). "This standard requires the federal courts to give considerable deference to state court decisions." *Forensic v. Birkett*, 501 F.3d 469, 472 (6th Cir. 2007). The Supreme Court has cautioned, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt*, 571 U.S. at 18 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

Indeed, the Supreme Court has repeatedly emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state-court adjudications of federal claims. The Supreme Court has admonished that a reviewing court may not "treat[] the unreasonableness question as a test of its confidence in the result it would reach under *de novo* review[,]" and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."). Rather, § 2254(d) "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,'" and does not function as a "substitute for ordinary error correction through appeal." *Harrington*, 562

19

U.S. at 102-03, quoting *Jackson*, 443 U.S. at 333 n.5 (Stevens, J., concurring in judgment). Thus, a petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103. The Supreme Court readily acknowledges that this is a very high standard, observing that: "If this standard is difficult to meet, that is because it was meant to be." *Id*. at 102.

### C.    Exhaustion and Procedural Default

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509 (1982). This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). The exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982). It "does not require pursuit of a state remedy where such a pursuit is clearly futile." *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

Procedural default is a related but "distinct" concept from exhaustion. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Procedural default is "a critical failure to comply with state procedural law," *Trest v. Cain*, 522 U.S. 87, 89 (1997), resulting in a bar to federal habeas review unless the petitioner has a sufficient basis for having the default excused, *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "A claim may become procedurally defaulted in two ways." *Williams*, 460 F.3d at 806. "First, a petitioner may procedurally default a claim by failing

to comply with state procedural rules in presenting his claim to the appropriate state court." *Id.*
"If, due to the petitioner's failure to comply with the procedural rule, the state court declines to
reach the merits of the issue, and the state procedural rule is an independent and adequate grounds
for precluding relief, the claim is procedurally defaulted." *Id.* "Second, a petitioner may
procedurally default a claim by failing to raise a claim in state court, and pursue that claim through
the state's 'ordinary appellate review procedures'" *Id.* (quoting *O'Sullivan*, 526 U.S. at 847). "If,
at the time of the federal habeas petition, state law no longer allows the petitioner to raise the
claim, the claim is procedurally defaulted." *Id.* A claim is fairly presented when it has been asserted
as a federal constitutional issue at every state of the state court review process. *Thompson v.
Warden, Belmont Corr. Inst.*, 598 F.3d 281, 285 (6th Cir. 2010); *Williams*, 460 F.3d at 806.

Procedural default, however, can be excused and will not preclude consideration of a claim
on federal habeas review if the petitioner can demonstrate: (1) "cause for the default and actual
prejudice as a result of the alleged violation of federal law;" or (2) "failure to consider the claim
will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. A "fundamental
miscarriage of justice" can occur only when the procedurally defaulted claim – supported by new
reliable evidence not presented at trial – would establish that the petitioner was "actually innocent"
of the offense. *Schlup v. Delo*, 513 U.S. 298, 324 (1995); *Lundgren v. Mitchell*, 440 F.3d 754, 764
(6th Cir. 2006).

### D.   Cognizable Federal Claim

A petition for a writ of habeas corpus filed by a petitioner imprisoned under the judgment
of a state court is governed by 28 U.S.C. § 2254(a), which permits the state prisoner to challenge
his custody "only on the ground that he is in custody in violation of the Constitution or laws or
treaties of the United States." *Id.* To say that a petitioner's claim is not cognizable on habeas review
is another way of saying that his claim "presents no federal issue at all." *Bates v. McCaughtry*,

934 F.2d 99, 101 (7th Cir. 1991).

Federal habeas corpus relief "does not lie for errors of state law[.]" *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990), and the federal court is bound by the state court's interpretations of state law. *See, e.g.*, *Wainwright v. Goode*, 464 U.S. 78, 84 (1983). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988) (citing *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987). "[F]ederal courts must defer to a state court's interpretation of its own rules of evidence and procedure" in considering a habeas petition. *Allen*, 845 F.2d at 614 (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985)).

## VI.     ANALYSIS

### A.     Ground One – Improperly Admitted Evidence

#### *1.     Relevant Law*

In Ground One, Gordon asserts that the trial court violated his constitutional rights to due process and a fair trial by admitting the following evidence at trial: (1) testimony from a detective regarding the jail call wherein Gordon allegedly admitted that he "ditch[ed] the gun"; and (2) the Facebook photograph of Gordon holding a gun. In response, Respondent argues that Ground One is noncognizable because the admissibility of evidence is a state law issue, and errors in state law that do not violate a specific constitutional right are not cognizable on habeas corpus review. Alternatively, Respondent argues that Gordon's claims in Ground One lack merit.

As a general rule, an error of state law in the admissibility of evidence does not constitute an infringement of a right guaranteed under the United States Constitution, and it is not cognizable in habeas corpus. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *Byrd v. Collins*, 209 F.3d 486, 528 (6th Cir. 2000). The Sixth Circuit has explained, however, that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate

due process and thus warrant habeas relief." *Bugh*, 329 F.3d at 512; *see also Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2000); *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000). The Sixth Circuit has cautioned that "courts 'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" *Bugh*, 329 F.3d at 512 (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)); *see also Dowling v. United States*, 493 U.S. 342, 352-53 (1990); *Burger v. Woods*, 515 F. App., 507, 509-10 (6th Cir. 2013) ("A due process claim premised on a mistaken state court evidentiary ruling faces a steep climb"). Under this standard, state court evidentiary rulings cannot rise to the level of due process violations unless they "offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Seymour*, 224 F.3d at 552 (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).

Beyond demonstrating the error resulted in a denial of fundamental fairness, a petitioner seeking habeas relief based on a state-court evidentiary ruling must also establish "actual prejudice" from the admission of the allegedly improper evidence. *Clemmons v. Sowders*, 34 F.3d 352, 357-58 (6th Cir. 1994); s*ee also Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000) (quoting *Leverett v. Spears*, 877 F.2d 921, 925 (11th Cir. 1989) (petitioner must show that admission of improper evidence is "material in the sense of a crucial, critical highly significant factor").

### 2.    *Jail Call*

Gordon challenged the trial court's admission of the jail call on direct appeal, arguing that the prosecution failed to properly authenticate it, which resulted in a violation of his constitutional rights to due process and a fair trial. *Gordon*, 2018-Ohio-2292, at ¶¶ 1, 63. The Ohio Court of Appeals determined that the trial court erred by admitting the jail call into evidence, but that its error was harmless in light of the "substantial evidence" presented in support of Gordon's convictions. *Id.* at ¶¶ 64, 66-67. The Ohio Court of Appeals explained its reasoning as follows:

{¶ 61} Before evidence is deemed admissible at trial, it must be authenticated. Ohio law "provides a liberal standard for the authentication of evidence." *State v. Inkton*, 2016-

Ohio-693, 60 N.E.3d 616, ¶ 73. Pursuant to Evid.R. 901(A), authentication "is satisfied by evidence sufficient to support a finding that the matter in questions is what its proponent claims." Specifically, Evid.R. 901(B)(5) states that a voice may be authenticated or identified, "whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing that voice at any time under circumstances connecting it with the alleged speaker."

{¶ 62} In the case at hand, Det. Sandoval testified about a phone call Gordon allegedly made from jail. The entirety of this direct examination testimony follows:

Q: Detective, are you familiar with a system in place in the county jail to monitor phone calls made by inmates from the county jail?

A: Yes.

Q: And can you give us a summary of how that system works as far as PIN numbers, identifiers like that and how calls are made?

A: Inmates when they arrive at county jail are given specific numbers to them to make phone calls. And I think they have to have money on — either to make calls straight out, they would have to have money reserved for those calls.

Q: And each inmate is given a unique PIN number, correct?

A: Yes.

Q: And that's not just for their calls, it's for anything that they would like to purchase in the jail their assigned an SO number; isn't that right?

A: That's correct an SO number, yes.

Q: And when those calls are made, are you aware that at the beginning of each call there's a warning read by the system that the call will be recorded?

A: Yes.

Q: I would then like to play for you * * * State's Exhibit 335. And I'd like for you to * * * listen to the beginning first and then we'll skim ahead to the pertinent parts. Okay?

* * *

Q: Did you hear the defendant identify himself at the beginning of this call?

A: At the beginning of the call they have the greeting and part of the greeting is they advise you this call is from — and they fill it in with their name, which was Neeko, and then it continued to advise you about it being monitored and recorded.

24

* * *

Q: Were you able to hear the defendant in that clip talking about ditching the gun?

A: Yes.

{¶ 63} On appeal, Gordon argues that this call was improperly admitted into evidence for two reasons: first, Det. Sandoval did not properly authenticate the call; and second, the content of the call was prejudicial. Gordon argues that the detective did not testify that he was familiar with or that he recognized Gordon's voice; rather, "he answered a leading question in the affirmative." Gordon next argues that the call was about a hypothetical and it had no relation to the facts of this case.

{¶ 64} Upon review, we find that the call was improperly authenticated. "To be admissible, a tape recording must be authentic, accurate, and trustworthy." *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 109. Det. Sandoval did not expressly identify Gordon as the caller. Rather, he testified that the caller identified himself as "Neeko" at the beginning of the call. Det. Sandoval also testified that he was "present" for the "sit down interview" of Gordon at the police station, approximately ten months before trial. According to the record, this is the only time Det. Sandoval heard Gordon speak. Furthermore, although Det. Sandoval testified about the basic process for making calls from the jail, he did not testify that the call played for the jury in the case at hand originated from Gordon's PIN number. Additionally, Det. Sandoval did not testify as to the accuracy of the jail call process.

{¶ 65} This court has previously held a jail call was properly authenticated when the following testimony was presented at trial: the victim testified that she received the calls in question from the defendant and identified his voice on the recording; and two employees from the Cuyahoga County Sheriff's Office testified about how jail calls are recorded and, particular to Christopher Thompson's case, how they downloaded calls made from Thompson's inmate number and calls that Thompson made using another inmate's account. *State v. Thompson*, 8th Dist. No. 96929, 2012-Ohio-921, 2012 WL 760515, ¶ 7-13. *See also State v. St. Anthony Ford*, 8th Dist. Cuyahoga No. 105698, 2018-Ohio-2128, 2018 WL 2671007, ¶ 52 ("[W]e are concerned with the manner in which the state laid the foundation for the recordings of Ford's jail-cell calls. Nevertheless, we cannot conclude that but for the introduction of the jail-cell calls, the result of the proceedings would have been different.").

{¶ 66} Turning to the contents of the call, we find that the error in admitting evidence that was not properly authenticated was harmless. We cannot say that, but for the introduction of this jail call, Gordon would not have been convicted of killing Nieves. Pursuant to Crim.R. 52(A), "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." This court has held that a "nonconstitutional error is harmless when there is substantial other evidence to support the guilty verdict." *State v. Ceron*, 8th Dist. Cuyahoga No. 99388, 2013-Ohio-5241, 2013 WL 6221103, ¶ 97.

{¶ 67} After reviewing the record, we find substantial evidence to support Gordon's convictions. Holsey, who knew Gordon, identified Gordon as the shooter. Two

eyewitnesses saw a man dressed similarly to Gordon run away from the scene. Gordon was captured on video running away from the scene. Forensic evidence shows gunshot residue on Gordon's hands when he was arrested approximately two hours after the shooting. Butler testified that Gordon said he "just did a drill" after the shooting.

{¶ 68} Accordingly, we conclude that the jail call was not unfairly prejudicial, and Gordon's third assigned error is overruled.

*Gordon*, 2018-Ohio-2292, at ¶¶ 61-68.

### 3. *Facebook Photograph*

Gordon challenged the trial court's admission of the Facebook photograph on direct appeal, arguing that the prosecution failed to properly authenticate it, which resulted in a violation of his constitutional rights to due process and a fair trial. *Gordon*, 2018-Ohio-2292, at ¶¶ 1, 69. Like the jail call, the Ohio Court of Appeals determined that the trial court erred by admitting the Facebook photograph into evidence, but that its error was harmless in light of the substantial evidence presented in support of Gordon's convictions. *Id.* at ¶ 73. The Ohio Court of Appeals explained its reasoning as follows:

{¶ 69} The leading case in Ohio regarding the authentication of electronically stored information from social networking websites appears to be *State v. Gibson*, 6th Dist. Lucas Nos. L-13-1222 and L-13-1223, 2015-Ohio-1679, 2015 WL 1962850, which this court has cited with approval in *State v. Inkton*, 2016-Ohio-693, 60 N.E.3d 616, ¶ 85-86.

Facebook users often "post content — which can include text, pictures, or videos — to that user's profile page" delivering it to the user's subscribers. These posts often include information relevant to a criminal prosecution: "party admissions, inculpatory or exculpatory photos, or online communication between users." Authentication concerns arise in regard to printouts from Facebook "because anyone can create a fictitious account and masquerade under another person's name or can gain access to another's account by obtaining the user's username and password," and, consequently, "[t]he potential for fabricating or tampering with electronically stored information on a social networking" site is high.

(Citations omitted.) *Gibson* at ¶ 35.

{¶ 70} In the case at hand, over Gordon's objection, the trial court admitted a photograph that Det. Sandoval testified he "came into the possession of" from the Facebook page of Yonko Boolin. Det. Sandoval testified that the home screen of Gordon's cell phone has the name "Yonko" on it. The picture, which is undated and contains no text or writing, shows two black males, one with a gun in the waistband of his jeans and the other holding

what appears to be a shotgun in front of his face. Det. Sandoval testified that "Neeko Gordon has — appears to be a shotgun in his right hand * * *." On cross-examination, Det. Sandoval further testified about the photo as follows:

> Q: Do you see anything on here that would say what date this was taken on?
>
> A: No.
>
> * * *
>
> Q: So we don't know when it was taken, right?
>
> A: I cannot tell you. Correct.
>
> Q: And we don't know whether this gun is even real, do we?
>
> A: No.
>
> Q: And we don't know who this guy is, do we?
>
> A: I don't know him.

{¶ 71} There is no evidence that Gordon has a Facebook page using the name Yonko Boolin. There is no evidence about who retrieved this photo or when it was retrieved. There is no evidence that Gordon is one of the men in the photograph. Upon review, we find that the state failed to present evidence to properly authenticate this photograph. *Compare State v. Yates*, 8th Dist. Cuyahoga No. 96774, 2012-Ohio-919, 2012 WL 759201, ¶ 36 (finding that a MySpace.com photograph was properly authenticated when "the state presented a representative from MySpace.com that testified as to the creation of the MySpace account [and] testimony from a witness [identified] on the MySpace page as being a friend of Yates, that this was Yates's MySpace account").

{¶ 72} Furthermore, we find that this photograph was improperly admitted as "other acts" evidence. The state did not suggest that one of the guns in the photograph was the murder weapon in the instant case. The photograph tends to show that Gordon is the type of person who has a gun, and therefore, it is probable to conclude that he acted in conformity therewith concerning the shooting of Nieves on the night in question. Under Evid.R. 404(B), evidence is inadmissible for this purpose.

{¶ 73} Despite finding that the trial court erroneously admitted the photograph, we must determine if the error was harmless. As analyzed previously in this opinion, this court concluded that there was substantial independent evidence of Gordon's guilt. Therefore, we cannot say that the admission of photograph was prejudicial to Gordon. Although the court erred by admitting this photograph, we find that the error was harmless.

{¶ 74} Accordingly, Gordon's fourth assigned error is overruled.

*Gordon*, 2018-Ohio-2292, at ¶¶ 69-74.

### 4.      *Application of Law*

Gordon has not demonstrated that the admission of the jail call or Facebook photograph into evidence resulted in "actual prejudice[.]" *Clemmons*, 34 F.3d at 357-58.  Nor has he demonstrated that the admission of that evidence was so egregious that it resulted in a denial of fundamental fairness and, therefore, violated his constitutional rights to due process and a fair trial. *Bugh*, 329 F.3d at 512.

As previously discussed, the Ohio Court of Appeals – the last state court to review Gordon's claims – concluded that the trial court's errors in admitting the jail call and Facebook photograph were harmless in light of the remaining evidence presented in support of Gordon's convictions. *Gordon*, 2018-Ohio-2292, at ¶¶ 66, 73.  This evidence included: (1) surveillance video showing Gordon running down the street and through an alley seconds after the shooting; (2) testimony from an eyewitness who knew Gordon and identified Gordon as the shooter; (3) two additional eyewitnesses who saw a man dressed similarly to Gordon running away from the scene; (4) forensic evidence showing gunshot residue on Gordon's hands approximately two hours after the shooting; and (5) testimony from an acquaintance of Gordon claiming Gordon called him after the shooting and told him he just "did a drill[,]" meaning that Gordon "just shot or killed somebody."  *Id.* at ¶¶ 82, 67, 35.

In light of the substantial evidence presented in support of Gordon's convictions, Gordon has not established that he suffered actual prejudice as a result of the trial court's admission of the jail call and Facebook photo into evidence. Nor has he demonstrated that the admission of that evidence was so egregious that it resulted in a denial of fundamental fairness and, therefore, violated his constitutional rights to due process and a fair trial. Accordingly, Ground One should be dismissed as noncognizable.

### B.      **Ground Two – Other-Acts Testimony**

### 1.    Relevant Law

In Ground Two, Gordon asserts that the trial court violated his constitutional rights to due process and a fair trial by allowing a witness to testify that Gordon "carr[ies] a revolver[,]" which was inadmissible other-acts evidence.  In response, Respondent again argues that Gordon's claim is noncognizable because the admissibility of evidence is a state law issue, and errors in state law that do not violate a specific constitutional right are not cognizable on habeas corpus review. Alternatively, Respondent argues that Gordon's claim in Ground Two lacks merit.

The law set forth in Ground One regarding challenges to the admissibility of evidence on habeas review applies equally here. In addition to that law, the Sixth Circuit has explained that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512.

### 2.    Other-Acts Evidence

Gordon challenged the trial court's admission of other-acts evidence on direct appeal, arguing that the trial court erred by allowing a witness to testify that Gordon "carries a revolver[,]" which resulted in a violation of his constitutional rights to due process and a fair trial. *Gordon*, 2018-Ohio-2292, at ¶ 1. Like the jail call and Facebook photograph, the Ohio Court of Appeals determined that although the trial court erred by admitting this evidence, the error was harmless in light of the substantial evidence presented in support of Gordon's convictions.  *Id.* at ¶¶ 79-80. The Ohio Court of Appeals explained its reasoning on Gordon's claim as follows:

> {¶ 75} Pursuant to Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *See also* R.C. 2945.59.

> {¶ 76} In *State v. Crosby*, 186 Ohio App.3d 453, 928 N.E.2d 795, 2010-Ohio-1584, ¶ 14-18 (8th Dist.), this court found that the trial court improperly admitted

testimony about the defendant being known to carry a gun in general.

> [T]he testimony about defendant being seen with a gun bears no * * * relationship to the offenses he was convicted of. Four witnesses testified that defendant was known to carry a gun. The first witness testified that he knew defendant to carry a 9 mm gun; however, he had not seen defendant for two years prior to the night of the offense, and he did not see defendant with a gun on the date in question.
>
> The victim and another witness testified that they knew defendant to carry a 9 mm gun; however, no mention was made of any time-frame or specific incidents when defendant was seen with a gun. The fourth witness testified that he has known defendant to carry a gun, but not a 9 mm. Other than the victim's testimony that defendant shot him, nobody testified that they saw defendant with a gun on or near the date of the offense.
>
> Furthermore, the weapon was not recovered in the instant case. Thus, the other acts evidence does not link defendant to the gun used to shoot the victim, and was therefore improperly admitted.

*Id.* at ¶ 14-16.

{¶ 77}  The *Crosby* court concluded that the admission of this testimony was harmless error under Crim.R. 52(A), because there was other credible evidence to support the defendant's convictions. *Id.* at ¶ 17-18.

{¶ 78} In the case at hand, Butler testified as follows about Gordon carrying a gun:

> Q: Does Neeko carry a revolver?
>
> A: Yes.
>
> Q: When did you see him with it prior to the shooting?
>
> * * *
>
> A: Like I told him two days before.

{¶ 79} We find that the case at hand is similar to *Crosby*. The gun was never recovered and there is no evidence other than speculation that a revolver was used to kill Nieves. "Federal and Ohio courts have recognized the introduction of other weapons evidence — i.e., irrelevant evidence of weapons unrelated to the charges — as error." *State v. Thomas,* 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, ¶ 36. The *Thomas* court noted that "[e]rror in admitting other weapons evidence falls generally into one of two categories: harmless error or prejudicial error requiring reversal." *Id.* at ¶ 38. "Cases in which courts have deemed error in the admission of other weapons evidence to be harmless generally involved overwhelming independent evidence of guilt." *Id.* at ¶ 39.

30

{¶ 80} As analyzed previously in this opinion, this court concluded that there was substantial independent evidence of Gordon's guilt; therefore, we find Butler's other weapons testimony to be harmless. Accordingly, Gordon's sixth assigned error is overruled.

*Gordon*, 2018-Ohio-2292, at ¶¶ 75-80.

### 3.    *Application of Law*

Gordon has not demonstrated that the admission of the other-acts evidence resulted in "actual prejudice[.]" *Clemmons*, 34 F.3d at 357-58. Nor has he demonstrated that the admission of that evidence was so egregious that it resulted in a denial of fundamental fairness and, therefore, violated his constitutional rights to due process and a fair trial. *Bugh*, 329 F.3d at 512.

As discussed in the resolution of Ground One, the prosecution presented substantial evidence in support of Gordon's convictions. *See Gordon*, at ¶¶ 82, 67, 35. Therefore, he has not established that he suffered actual prejudice as a result of the trial court's admission of the other-acts evidence. Nor has he demonstrated that the admission of that evidence was so egregious that it resulted in a denial of fundamental fairness and, as a result, violated his constitutional rights to due process and a fair trial. *See Bugh*, 329 F.3d at 512. Accordingly, Ground Two should be dismissed as noncognizable.

### C.    **Ground Three – Sufficiency of the Evidence**

### 1.    *Relevant Law*

In Ground Three, Gordon argues that his convictions were not supported by sufficient evidence, and that the trial court erred by denying his motion for acquittal. As a result, he asserts that his convictions are not "constitutionally sustainable."  In response, Respondent argues that Gordon's challenge to the sufficiency of the evidence on direct appeal related only to the evidence identifying him as the shooter. Therefore, Respondent argues that – to the extent Gordon attempts to challenge any of the other elements of the charged offenses – those claims are procedurally

defaulted. Respondent also argues that – to the extent Ground Three can be construed as a challenge to the manifest weight of the evidence – such claims are not cognizable on habeas review. Responded further argues that any reasonable trier of fact could have found Gordon guilty beyond a reasonable doubt, and that the Ohio Court of Appeals' decision on direct appeal regarding the sufficiency of the evidence was not unreasonable.

Challenges to a state court conviction based on the sufficiency of the evidence are properly cognizable in a federal habeas corpus petition. *Jackson*, 443 U.S. at 321. In reviewing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. The reviewing court may not "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the [fact-finder]." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

On habeas review, this question involves "a double layer of deference[.]" *White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009). "First, we must view the evidence in the light most favorable to the prosecution, and determine whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Mathis v. Colson*, 528 F. App. 470, 476 (6th Cir. 2013) (quoting *Jackson*, 443 U.S. at 319). "Second, 'even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable.'" *Id.* (quoting *Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir.2009)). Under the *Jackson* standard, a habeas petitioner "who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle." *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011) (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

### 2. *Sufficiency of the Evidence*

Gordon challenged the sufficiency of the evidence on direct appeal, arguing that the prosecution failed to prove that he was the person who shot and killed the victim. *Gordon*, 2018-Ohio-2292, at ¶ 48. The Ohio Court of appeals rejected Gordon's challenge to the sufficiency of the evidence, explaining its reasoning as follows:

> {¶ 48} In the case at hand, Gordon argues that there was insufficient evidence to convict him of all counts, because the state failed to prove that he was the person who shot and killed Nieves. "Every criminal prosecution requires proof that the person accused of the crime is the person who committed the crime. This truism is reflected in the state's constitutional burden to prove the guilt of 'the accused' beyond a reasonable doubt." *State v. Tate*, 140 Ohio St.3d 442, 19 N.E.3d 888, 2014-Ohio-3667, ¶ 15.

> {¶ 49} Specifically, Gordon argues that he was merely in the area of W. 38th St. and Robert Avenue, in Cleveland, when the shot was fired. Nobody saw him with a gun and no gun was recovered. Three eyewitnesses described a man wearing a red shirt and black pants who was running away from the scene. Holsey identified Gordon as the shooter, and it is undisputed that Gordon was wearing an orange shirt at the time of the shooting. According to Gordon, this evidence is insufficient to support his convictions.

> {¶ 50} Gordon was convicted of the following offenses: murder in violation of R.C. 2903.02(B); felonious assault in violation of R.C. 2903.11(A)(1); two counts of felonious assault in violation of R.C. 2903.11(A)(2); discharge of firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3); tampering with evidence in violation of R.C. 2921.12(A)(1); and having a weapon while under disability in violation of R.C. 2923.13(A)(2).

> {¶ 51} Gordon's arguments focus on the sufficiency of the evidence that he — rather than a black male with a red shirt — shot Nieves. As this assigned error only concerns the shooter's identity, we need not analyze every element of each offense. Upon review of the record, particularly Holsey's identification of Gordon as the shooter coupled with the surveillance video of Gordon running from the scene, we find that the state presented sufficient evidence that, if believed, would convince the jury of Gordon's guilt. Accordingly, Gordon's first assigned error is overruled.

*Gordon*, 2018-Ohio-2292, at ¶¶ 48-51.

### 3. Application of Law

Applying the first layer of the "double layer of deference[,]" and viewing the evidence discussed above in the light most favorable to the prosecution, any rational trier of fact could have found that the prosecution proved Gordon's identity as the shooter beyond a reasonable doubt. As

the Ohio Court of Appeals explained, the prosecution presented testimony from a witness identifying Gordon as the shooter, as well as surveillance video of Gordon running from the scene. *Id.* at ¶ 51. This was sufficient for purposes of establishing Gordon's identity as the shooter. Applying the second layer of deference, the Ohio Court of Appeals' determination in this regard was not unreasonable.

To the extent that Ground Three can be construed as challenging the sufficiency of any other elements of the charged offenses, those claims are procedurally defaulted because Gordon did not raise them in state court. *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 847) ("[A] petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures'"). Additionally, to the extent that Ground Three can be construed as challenging the manifest weight of the evidence, it is well-settled that claims regarding the manifest weight of the evidence are grounded in state law and are, therefore, not cognizable on federal habeas review. *See, e.g.*, *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir. 1983) (recognizing that the Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those convicted without sufficient proof to allow a finding of guilt beyond a reasonable doubt).

 Accordingly, Ground Three lacks merit and should be denied.

## VII.    RECOMMENDATION REGARDING CERTIFICATE OF APPEALABILITY

### A.    Legal Standard

As amended by AEDPA, 28 U.S.C. § 2253(c)(1) provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "[a] 'substantial showing' requires the applicant to 'demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further.'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996)).  The statute requires that certificates of appealability specify which issues are appealable. 28 U.S.C. § 2253(c)(3).

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. "If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." *Id.*; *see also* 28 U.S.C. § 2253(c)(3) ("The certificate of appealability under [§ 2253(c)(1)] shall indicate which specific issue or issues satisfy the showing required by [§ 2253(c)(2)]."). In light of the Rule 11 requirement that the court either grant or deny the certificate of appealability at the time of its final adverse order, a recommendation regarding the certificate of appealability issue is included here.

## B.    Analysis

If the Court accepts my recommendations, Gordon has not made a substantial showing of a denial of a constitutional right. Gordon's Ground One, Ground Two, and Ground Three claims are procedurally defaulted, noncognizable, and/or meritless. Because jurists of reason would not find these conclusions debatable, I recommend that no certificate of appealability issue in this case.

## VIII.   RECOMMENDATION

Because Gordon has presented only claims that are noncognizable in a federal habeas proceeding, procedurally defaulted, or otherwise lack merit, I recommend that the Court DISMISS and/or DENY the first, second, and third grounds of Gordon's petition for a writ of habeas corpus under 28 U.S.C. § 2254. I also recommend that Leon Hill, the current warden of the Madison Correctional Institution, be substituted as the proper respondent in this case.

Dated: 9/9/2022

s/Jennifer Dowdell Armstrong
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## IX.     NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and

recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).